Filed 5/5/22  P. v. Halbower CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>RODNEY LYNN HALBOWER,<br><br>          Defendant and Appellant. | A155724<br><br>(San Mateo County<br>Super. Ct. No. SF395491A) |

Defendant and appellant Rodney Lynn Halbower challenges the sufficiency of the evidence to support a jury's finding he was competent to stand trial.  We affirm.

### BACKGROUND[1]

In 2014, through DNA evidence, Halbower was implicated in two long-unsolved murders that occurred in San Mateo County in 1976.  Thereafter, the San Mateo County District Attorney filed a felony complaint charging Halbower with two counts of murder (Pen. Code, [2] § 187, subd. (a)).

In March 2015, the trial court suspended criminal proceedings after defense counsel expressed a doubt as to Halbower's mental competency.  In

---

[1] We omit the facts of the underlying offenses as they are not relevant to the competency issue raised on appeal.

[2] All further undesignated statutory references are to the Penal Code.

1

June 2016, a jury found Halbower competent to stand trial.[3] Following a preliminary examination, Halbower was held to answer and charged by information with two counts of murder (§ 187, subd. (a)).[4] In September 2018, a separate jury found Halbower guilty on both counts of murder. The trial court sentenced appellant to two concurrent terms of life in state prison.

This appeal followed. It does not challenge the 2018 jury verdict but instead argues insufficient evidence supports the 2016 determination of competency, thus the jury's findings and the judgment of conviction must be reversed. We disagree.

## COMPETENCY TRIAL

### A.    *Pretrial Proceedings*

On March 3, 2015, over Halbower's objection, defense counsel declared a doubt as to Halbower's competence. The trial court appointed psychiatrist Jeffrey Gould and psychologist Robert Cassidy to evaluate Halbower. In their August 2015 reports, Dr. Gould found that Halbower was competent to stand trial, and Dr. Cassidy found that he was not.

Defense counsel retained psychologist Jeffrey Kline, who conducted a formal competency evaluation in February 2016. Halbower refused to cooperate with follow-up testing in March. In a report dated April 14, 2016, Dr. Kline concluded that Halbower was not competent to stand trial. As a result, the prosecution requested a jury trial to determine the issue of competency.

---

[3] We summarize the evidence on the competency issue below.

[4] It was initially alleged that Halbower was armed with a deadly weapon (§ 12022) during the commission of the murders, but at trial and prior to jury deliberation, the court dismissed the arming enhancements on the motion of the prosecutor.

### B.     Testimony at the Competency Trial

### 1.     Dr. Jeffrey Gould[5]

Dr. Jeffrey Gould testified as to his August 2015 competency evaluation of Halbower, which included a review of records and a personal interview, and resulted in his August 17, 2015 report finding Halbower to be competent to stand trial.  Halbower accurately responded to questions about the charges against him, their seriousness, and the nature of the pending criminal proceedings.  This included Halbower's appropriately nuanced explanation of what it means to plead "not guilty by reason of insanity."  Halbower accurately explained the trial process and the parties involved, including the different roles of the district and defense attorneys, the judge, and the jury.  Dr. Gould testified, "[A]t this point in time we're getting farther in the evaluation.  He's not exhibiting any signs of a mental illness."  There was no demonstration of any psychotic disorders, and there was no evidence of psychotic symptoms in Halbower's medical records.  When asked about the charged offenses and the specific role of DNA, Halbower demonstrated an understanding of DNA, asserted an appropriate defense denying culpability, and complained about his treatment in the criminal justice system "because [he's] . . . poor."  Halbower knew who his attorney was and articulated their disagreement about his prospective defense:  "He doesn't even question me about it.  I know what it is.  I will warn the DA right here.  I don't give a damn.  My defense is unlawful discrimination.  I become more sophisticated.  It's DNA discrimination.  That's my defense."  Halbower appropriately explained his understanding of his role in the courtroom and how to conduct himself, even if he disagreed with a witness, saying one should "[k]eep your

---

[5] Dr. Gould was called to testify by the district attorney out of order for scheduling reasons.

mouth shut." If he believed a witness was lying, he "would ask the court to bring criminal charges against the person, perjury." If he did not understand what a witness said, Halbower explained, "You're supposed to consult with your lawyer, if you have a lawyer. If not, ask the judge."

Discussing his psychiatric history, Halbower recounted that he had previously experienced depression, for which he had taken medication. He denied experiencing any other psychiatric symptoms. This information was consistent with the 940 pages of medical records that Dr. Gould reviewed, which contained no information regarding any other psychiatric symptoms, diagnoses, or psychiatric medication.

Last, Dr. Gould assessed Halbower's mental status as "normal," explaining, his "thought process was organized and linear. There was no looseness of association or flight of ideas present during the interview." Dr. Gould reviewed the reports of Drs. Cassidy and Kline, and while he noted they contained "discussions that were, frankly, more strange, more bizarre than the ones that I had with him," they did not change his opinion that Halbower was competent to stand trial.[6] When discussing Halbower's ability

---

[6] Dr. Gould's 2015 report was introduced into evidence at trial and included his further opinion that "Mr. Halbower does *not* suffer from an Axis I major mental disorder or other psychiatric condition at the present time that could impair his competency to stand trial." Although Dr. Gould did note that Halbower's personality disorder was impacting his relationship with this and any defense counsel, it did not impact Dr. Gould's determination of competency: "Mr. Halbower does not cooperate with his defense counsel and reported his intention to continue to be uncooperative in this setting. It is unlikely that he will cooperate with his current or any other defense counsel. Again, it is my opinion that the defendant's lack of cooperation with his attorney is not the product of an Axis I major mental disorder. Therefore, he does not suffer from a mental illness that would usually be considered sufficient to impair his competency to stand trial."

to communicate with counsel, Dr. Gould recounted that Halbower had a "negative" view about his attorney: " 'He expects me to lay down and let him go off in every direction he wants . . . [¶] . . . [¶] . . . I can't think of anything positive we see eye to eye on.' " Dr. Gould opined that Halbower's "lack of cooperation with the attorney is not the product of a major mental disorder." Rather, Dr. Gould concluded Halbower "likely does suffer from a personality disorder that directly influences his dysfunctional relationship with his defense counsel."

### 2.    Halbower's Testimony

The defense called Halbower to testify. Halbower stated that he understood the nature of the proceedings, even though "they're strange to me." Halbower explained he had met his defense attorney, Mr. John Halley,[7] twice for "[v]ery short periods of time, maybe 15 to 30 minutes at the jail." When Halbower told his attorney, "I'm going to ask the judge to dismiss you as counsel because I feel I can represent myself or get another counsel," the attorney responded, "[W]ell, if you do that, I'm going to have to tell the court that you're incompetent to stand trial and ask for doctors to see you."

At the next court date, Halbower "said what [he] had to say," and his attorney declared a doubt. Halbower objected to the declaration of a doubt and testified, "[I]t is my position, and I do state that I am fully competent to stand trial. . . . I have been trying to get it, to try—even told the court and demanded that my constitutional rights to a speedy trial and to a—to confront accusers, to call witnesses on my behalf, and even to represent

---

[7] John Halley is the court-appointed attorney assigned to represent Halbower in connection with the criminal charges filed against him. Paul DeMeester is the court-appointed attorney assigned to represent Halbower in the competency proceedings.

myself, which is a constitutional right. [¶] ¶And nobody is listening to it." Halbower later reiterated, "I believe I was competent. I've been certified to be competent before in the past. I've been charged and represented myself even."

When asked if he suffered from a mental disorder, Halbower offered, "I . . . have [a] . . . few little problems like these grandiose ideas at times. . . . [¶] . . . [¶] . . . I do feel I have a little narcissism in me, . . . I have a tendency at times to exaggerate things, you know." When asked if he could assist his attorney in his defense, Halbower responded, "I have tried in every way to convince Mr. Halley of a defense in this case that I do have. And he might not agree with it. Well, then he can get on down the road if he does not agree with it." Halbower objected to the follow-up question inquiring about his specific defense, stating, "And I object to this question. Because I don't feel like I'm really supposed to or have to—that I have to divulge my defense to the prosecution or to the court. [¶] I have a defense, and it should be investigated by the investigators, a private investigator, and all that. And it hasn't."

Halbower was asked to enumerate the witnesses he would like to see in the criminal case. They included an analogist, a genealogist, a linguist, a geographer, a phonetician, and anagramologist, a metaphysicist, a geopolitician, a mythologist, the Roman Catholic Church pontiff, and a Philadelphia lawyer. Halbower explained the need for these witnesses, in part because of a book bearing his name he had been shown by a gray-haired old man in reform school on his 14th birthday. He also explained the import of geography on his life and drew related representations that were marked as exhibits in the competency trial.

Halbower explained that one of the reasons he wanted to represent himself was to stand behind the podium: "[W]hen an individual represents himself in a criminal matter, especially in a serious criminal matter, through my observations and experience, that he's given a lot more latitude when it comes to questioning and things of that nature." At the conclusion of his testimony defense counsel asked, "And as you sit here now on today's date, do you believe that you are mentally competent to stand trial?" To which Halbower responded, "Yes, I do. I swear that I am, in fact."

On cross-examination, the district attorney asked Halbower about his family history, his criminal past—including testimony at different criminal trials, related sentences, several successful prison escapes, and his parole board and extradition hearings—as well as his employment history. Halbower testified that during these periods in custody, no one had "disclosed to him" he had a specific mental illness. Halbower explained his understanding of the charged murders and the DNA evidence that had implicated him and also narrated the circumstances surrounding the initial police interviews.

On redirect, Halbower objected to his attorney's continued inquiry into the police interviews and asked the court, "Am I on trial here for murders, or am I being considered for competency to represent myself?" The court affirmed it was a competency trial and asked Halbower to wait to speak until his attorney asked the next question. Halbower responded, "Yeah. That's what I'm talking about. I want to be the one asking the questions."

### 3. Dr. Robert Cassidy

Dr. Robert Cassidy is a licensed psychologist employed by the State of California to provide annual progress reviews for individuals committed to the Coalinga State Hospital as sexually violent predators. Dr. Cassidy met

with Halbower on April 9, August 6, and August 7, 2015, totaling over six hours, before submitting his August 10 competency report to the court. Halbower was "quite consistent" in the interviews. He was "essentially polite. He was willing to be interviewed. He was responsive to questions in that I would ask a question; he would provide me a response. [¶] He was in good behavioral control."

But, as Dr. Cassidy testified, Halbower "expressed an extensive amount of delusional thinking, both spontaneously . . . . And he also expressed delusions in response to my efforts to find out more about his thinking in a particular area." Halbower did not evidence or report auditory hallucinations—a symptom of psychoses—and presented as "of at least average intelligence."

In the interview, Halbower presented drawings to Dr. Cassidy similar to the drawings Halbower made when testifying. Halbower also discussed with Dr. Cassidy the Pope and some of the other potential witnesses about whom he testified.

Dr. Cassidy stated that Halbower has an interesting "intermittent" connection to reality. His communications can seem "reality based," but they can also be "quite different and express[] significant distortions of reality," which are typically viewed by mental health professionals as "delusional." As an example of one of Halbower's grandiose delusions, Dr. Cassidy cited "the belief that he somehow could elicit the support of the Pope to come and provide assistance in his legal defense." Halbower also demonstrated a "persecutory feeling" that his current case was generated by others' efforts to persecute him rather than being based on evidence against him.

Dr. Cassidy did not observe any manifestations of organic brain impairment or impairment of cognitive function but testified that Halbower

8

did demonstrate signs of a thought process disorder. "He would get off track. He would lose the thread of the conversation or the focus of the questions." In his review of over 930 pages of records, Dr. Cassidy did not see any findings of psychosis or a delusional disorder diagnosis. While Halbower was treated for a period of depression, that depression was "limited and moderate in scope" and was not considered a major affective or depressive disorder. Forensic mental health staff did not record any concerns about Halbower's mental health or his stability. Yet, Dr. Cassidy ultimately opined that "a mental disorder is present as manifest[ed] by [Halbower's] delusional ideation, both grandiose and paranoid delusional ideation[,] as well as a thought process disorder." Halbower's testimony at the competency trial confirmed Dr. Cassidy's prior opinions. Dr. Cassidy concluded that as a result of a paranoid delusional disorder, Halbower was incompetent to stand trial: "It's difficult to have a rational conversation with him about the things that most attorneys would want to focus on."

### 4. Dr. Jeffrey Kline

Halbower's retained expert, Dr. Jeffrey Kline, testified he observed Halbower meet with defense attorney Halley for 50 minutes on February 17, 2015. Dr. Kline met with Halbower alone for two and a half hours on February 23. He attempted to meet with Halbower again on March 22, 2015 for the competency evaluation, but Halbower refused the visit.

Dr. Kline opined that Halbower suffered from a delusional disorder that was "particularly prominent" when discussing the criminal case in detail. He concluded that Halbower was "incompetent based on both prongs. He's not capable of rationally understanding, appreciating the proceedings, nor is he capable of collaborating with counsel in a rational manner."

9

Based on his personal observations of Halbower's interaction with his criminal attorney, Dr. Kline testified Halbower "wasn't capable of holding a rational conversation with his attorney, almost at all." Yet, in talking about Halbower's background and education, as well as general facts about trial competency, including the charges, roles of the attorneys, and possible pleas, Halbower "seemed reasonable and rational and organized and coherent and cooperative" and "had a good factual understanding of adjudication." It was when questioning Halbower in detail about the trial situation that persecutory and grandiose delusions "erupted."

Dr. Kline acknowledged the absence of any psychosis or delusional disorder in Halbower's records but testified, "It's only under certain circumstances and certain parts of one's personality that collapses into delusions." At their February 17 meeting, Halbower's thinking "was organized. He was coherent. He was reasonably articulate." Halbower had a "very strong understanding" of the proceedings and the roles of the judge, jury, and counsel. But he "became increasingly irrational and delusional as we talked about his case . . . ." Dr. Kline opined that these disturbances impacted Halbower's ability to collaborate with counsel: "he was not competent on that prong with respect to the attorney-client working relationship."

### 5. Halbower's Additional Testimony

Halbower later asked to be recalled to testify in response to a list of specific questions that he had drafted. Halbower wanted to respond to these previously unasked questions because he felt he was "being deprived of counsel in this matter." Halbower complained that his competency attorney was trying to inflame the minds of the jurors "to make you think that I'm a terrible, terrible evil person, which is not the case." He denied committing

the alleged murders, explained a prior prison escape, and described his experience representing himself. Halbower explained he did not want his appointed defense attorney to represent him in the criminal case because "Mr. Halley has violated the trust that I had with him." Halbower declined to answer almost all of the district attorney's questions on cross-examination as well as his attorney's follow-up questions on redirect and was excused as a witness.

## DISCUSSION

### A.    Applicable Law and Standard of Review

"As a matter of due process, '[a] defendant may not be put to trial unless he " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him.' " ' (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354)." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 386 (*Buenrostro*).) "A defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, the defendant is 'unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (§ 1367, subd. (a).)" (*People v. Marshall* (1997) 15 Cal.4th 1, 31 (*Marshall*).)

"The law presumes a person is competent to stand trial. (Pen. Code, § 1369, subd. (f).) 'When the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence.' (*People v. Mendoza* (2016) 62 Cal.4th 856, 871 [(*Mendoza*)]; see Pen. Code, § 1369, subd. (f); *Medina v. California* (1992) 505 U.S. 437, 446 . . . [allocation of the burden of proof to a criminal defendant to prove incompetence does not violate procedural due process].)" (*Buenrostro*, *supra*, 6 Cal.5th at p. 387.)

11

We apply "a deferential substantial evidence standard of review." (*Mendoza, supra,* 62 Cal.4th at p. 871.)  When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial.  (*Id.* at pp. 871–872, citing *People v. Marks* (2003) 31 Cal.4th 197, 219, fn. 3.)  "In reviewing a jury verdict that a defendant is mentally competent to stand trial, an appellate court must view the record in the light most favorable to the verdict and uphold the verdict if it is supported by substantial evidence.  [Citation.]  Evidence is substantial if it is reasonable, credible, and of solid value."  (*Marshall, supra,* 15 Cal.4th at p. 31.)  "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom."  (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.)  "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' "  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence."  (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."  (*Zamudio,* at p. 357.)

### B.    Analysis

Evidence of Halbower's grandiose and paranoid delusions was presented at the competency trial, but we disagree with counsel's assertion on appeal that Halbower's incompetency was "readily apparent."  Instead, we conclude there was substantial evidence Halbower was not suffering from a mental illness that deprived him of the ability to understand the proceedings and to assist counsel.

### 1. Understanding of the Proceedings

All three psychiatric experts and the parties on appeal agree that there is substantial evidence that Halbower understood the nature of the proceedings. The three testifying experts affirmed that this understanding included an understanding of the roles of the attorneys, judge, witnesses, and jurors. Halbower had in fact represented himself in earlier court proceedings. He was at least of average intelligence and responded well to direct questions. Halbower not only knew the charges against him, he was aware of the facts underlying those charges and that DNA evidence had linked him to those charges.

Dr. Gould opined that Halbower was "more sophisticated than many who are found competent." Dr. Cassidy described Halbower as being "well oriented," with "a good fund of knowledge. He was able to use abstract concepts. He has a good vocabulary base. He has some capacity to problem solve." Dr. Kline testified that Halbower's "thinking was organized. He was coherent. He was reasonably articulate." As appellant accurately states, "It came to light during direct and cross-examination that [Halbower] understood the competency and trial processes and the criminal charges against him." Halbower's understanding of the competency and criminal proceedings presents no issue here.

### 2. Mental Disorder

But where the disagreement and basis for appeal lie is in the conflicting evidence concerning any mental disorder and Halbower's ability to assist counsel with the presentation of a defense. Experts for the defense and the prosecution noted the significant absence of any reported major mental disorder in more than 40 years of medical records. While two experts opined that Halbower suffered from a delusional disorder that rendered him

13

incompetent to stand trial, the jury was entitled to credit the expert testimony of Dr. Gould that Halbower had the mental capacity to cooperate with and assist counsel.

The current argument that Dr. Gould's testimony should be disregarded because he failed to question Halbower about "the defense he wanted to present at trial," and instead followed an "agenda" that "failed to uncover the mental illness that prevented [him] from assisting his counsel" is inconsistent with the record. Dr. Gould did consider the reports of Drs. Cassidy and Kline and acknowledged that he saw personality traits that could be diagnosed as personality disorders based on Halbower's antisocial, grandiose, and paranoid personality. Nevertheless, Dr. Gould concluded Halbower did not suffer from "a major mental illness" that affected his ability to cooperate with counsel. The jury had no obligation to reject this expert evidence (see *Mendoza, supra,* 62 Cal.4th at p. 883 ["We must emphasize that it is not our function to substitute our judgment for that of the jury or to reweigh the evidence."]). And a simple numeric count of two experts versus one does not render the competency trial invalid. (See, e.g., CALCRIM No. 301 ["The testimony of only one witness can prove any fact."]; CALCRIM No. 302 ["If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. . . . What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."].)

Perhaps most significantly—though minimized on appeal—the jury had the opportunity to observe Halbower's conduct and demeanor in court and independently assess his two separate opportunities to testify. Rather than

14

being forced to rely exclusively on expert testimony, the jurors were able to hear Halbower personally explain his understanding of the competency and criminal processes, his disagreement with his criminal attorney concerning his own competency and proposed defenses, and his explanations for the proposed witnesses that Drs. Cassidy and Kline considered "delusional." Applying the "deferential substantial evidence standard of review" (*Mendoza, supra,* 62 Cal.4th at p. 871), there is more than sufficient evidence that Halbower did not suffer from a mental disorder that prevented him from understanding the nature of the criminal proceedings or assisting counsel. (§ 1367, subd. (a).)

### 3. Ability to Assist Counsel

The argument on appeal is that there was "overwhelming evidence" that Halbower was "incapable of assisting his counsel in the conduct of a defense in a rational manner." But again, though conflicting, there was sufficient evidence of Halbower's ability to work with counsel at trial—if he wanted to—to support the jury's verdict of competency.

As Halbower explained at the competency trial, he had a poor relationship with his criminal attorney because "Mr. Halley has violated the trust that I had with him." Halbower testified that he decided to stop cooperating when his criminal attorney raised a doubt about his competence. Halbower complained that his attorney "won't work with me." He wanted to do everything and for Halbower to just "lay down." Halbower testified, "I have tried in every way to convince Mr. Halley of a defense in this case that I do have. And he might not agree with it." Moreover, Halbower declared that he would assist his attorney in the conduct of his defense "*only if* the defense is a defense that we agree upon . . . ." (Italics added.) Halbower also made it

15

clear that, if his criminal attorney refused to employ Halbower's defense theory, he would move to get new counsel or to represent himself.

Halbower's dispute with his criminal attorney does not invalidate his competency to stand trial. In *People v. Hightower* (1996) 41 Cal.App.4th 1108, we rejected a defendant's contention "that his disruptive behavior in the courtroom and disputes with defense counsel prove that he was not competent to stand trial." (*Id.* at p. 1112.) We reasoned, "His conduct demonstrates an unwillingness to cooperate with defense counsel but does not constitute proof of mental incompetence. '[T]he *test,* in a section 1368 proceeding, *is competency to cooperate, not cooperation.*'" (*Hightower*, at p. 1112, italics added; accord, *People v. Clark* (2011) 52 Cal.4th 856, 893.)

In the present case, the jury was entitled to credit expert testimony that Halbower had the mental capacity to cooperate, even if he chose not to. The jurors were able to personally assess Halbower's own explanation for his lack of cooperation. That two experts opined Halbower would not be able to cooperate with counsel does not prove a lack of substantial evidence to support the jury's finding. The jury was not under any obligation to adopt the contrary expert opinions. Such a requirement would undermine the jury's role, and effectively transform the competency decision into a trial by experts rather than by jury. (*People v. Samuel* (1981) 29 Cal.3d 489, 498.)

Contrary to the assertion on appeal, Halbower's case is not comparable to *People v. Samuel, supra,* 29 Cal.3d 489. In *Samuel,* unlike here, there was "persuasive and virtually uncontradicted defense evidence proving [the defendant's] mental incompetence to stand trial." (*Id.* at p. 506.) The "impressive array of evidence" included testimony from five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians, as well as four additional psychiatric reports.

"Without exception, each witness and every report concluded that . . . the [defendant] was incompetent to stand trial." (*Id.* at p. 498; see *People v. Stanley* (1995) 10 Cal.4th 764, 808–809 [*Samuel* involved a "virtually one-sided showing of incompetence"].)  Where both Dr. Gould and Halbower himself testified as to Halbower's competency, "[t]his is certainly not a case like *Samuel* in which no reasonable trier of fact could reject the defense evidence." (*Mendoza, supra,* 62 Cal.4th at p. 883.)

In sum, where there was substantial and credible evidence presented that Halbower was not suffering from a mental illness that deprived him of the ability to understand the proceedings and to assist counsel in his defense; the presumption of mental competence to stand trial was not rebutted.

## DISPOSITION

The judgment is affirmed.

_____
Desautels, J.*

WE CONCUR:


_____
Pollak, P.J.


_____
Brown, J.

*A155724  People v. Halbower*

---

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.